We have four arguments this morning, and the first is 17-1000 In Re Dehlin. Is that how you say it? Yes. Please begin. May it please the court. I am Paul Jettner, and along with my co-counsel, Patrick Smith, we represent the appellants Marcus Dehlin and Sorenzo A.B. Thank you for your time this morning and consideration. This is a small case. We realize there's one rejection of one claim, but it's an important case for the appellant, and we believe that the issue of law presented here is important for patent practitioners and the public at large. In this appeal, the appellants assert that the Patent Trial and Appeal Board committed two reversible errors. Specifically first, we submit that the board erred in sustaining a section 103 rejection after having found that neither of the cited references disclosed the second backwardly folded flap limitation that's in Claim 5. The board's reasoning that the missing limitation would have flowed naturally from the combination is logically and factually flawed. Specifically, going back to the final rejection by the examiner. The examiner interpreted the primary reference, CARO, as meeting the limitation. The extension, the panel extension 108 of the CARO reference, the examiner interpreted as meeting the second backwardly folded flap limitation that's in the claim. That interpretation of CARO was essential to both the 102 and 103 rejections. Now the CARO reference, I think is undisputed, is silent about the location of that extension 108 once the insert is folded. Am I remembering correctly that the board said that the examiner was wrong in saying you can actually tell from CARO what's happening to that other flap, but then the board said, and for that reason no anticipation, because it's not necessary that it happened in the way that is now claimed in this application, but then the board said there are really only three things that can happen to that. You tear it off, you fold it this way, you fold it the other way. Each one of those is an obvious possibility. Is that, and that's what they meant by flows naturally. Okay, I don't think that's what the board meant by flows naturally. Well, even putting that aside, why is that not obvious? There are only three things that can happen to the flap. Well, that's not in CARO, for one. That's in the appellant's argument, you know, before the board and before this, particularly before the board. It's an argument we made with the examiner. What possibilities are there besides those three? Okay, one of the possibilities, which we acknowledge, is that it could be backwardly folded against the back surface as the examiner asserted. Another possibility is that it could be torn off. A third possibility is that it could be doubled up and folded over the front of the panel. And I would submit that if you look at figure six of CARO, you'll see that, I believe it's flap 108. Let me see that. It's on page nine of your brief. Yes, I believe so. Yes, in figure six of CARO, you see that flap 106 has five lines on it, and flap 108 has no lines. And then if you look at figure seven, flap 106 has the five lines on it again. And those are two different sides. So, like, when 102 is folded onto 104, we see one side of flap 106 in figure six. And then on figure seven, we see the other side of extension 106. Can I ask a question that's probably neither here nor there? But between figure six and figure seven, have the pills moved? No, Your Honor. Why? In figure 122, are those pills in the little bubbles? Correct, Your Honor. In 102, those are openings 110. Those are holes 110 in panel 102. So when panel 102 is folded over 104, then the pills are kind of projecting through those holes. Right. This is why this may be completely insignificant. But if you look at 108 in figure six, in kind of the second panel, you have the pills in boxes, let's call them two and three. And then when you go to figure seven, they've moved over to one and two. Is that just a— I'm not sure I follow, Your Honor. Okay. Never mind then. Okay. But if—so at least as illustrated in figure six and seven, Caro has those five—shows five lines on extension 106. But when they're folded over, when 106 is folded over as shown in 108, now there's no lines. So if you look at figure eight— I don't know, Your Honor. Caro doesn't explain. So how should we decide it means anything? So it may not. But the point is, I think in figure eight there, what's labeled 106 might be 108 mislabeled. I mean, that's a possibility. Another possibility is extension 108 could be in between the two panels, 102 and 104, as it's folded up. But the law of inherency, as the Court is well aware, depends on something— you can say something is inherent in the prior art if it necessarily follows. I didn't think the PTO was relying on inherency here. I thought that it was obviousness in saying that there's three different ways that 108 could be treated. You've identified what they were. And given the prior art of record, it would have been obvious to fold 108 over as required by their claims. I don't believe that's correct, Your Honor. You think it was an inherent— There was 102 and 103 rejection of Claim 5 that went on appeal to the Board. And the primary issue was, you know, when the insert is folded, we don't know exactly— and Carl doesn't explain what happens to 108, okay, extension 108. So we argued that it's not expressly disclosed that it's backwardly folded, and it's not inherent that it's backwardly folded under the doctrine of inherency. And the Board agreed with us on that point and made the determination, factual determination, that I don't believe is challenged, that Carl does not disclose the second backwardly folded flap limitation, doesn't disclose it explicitly or inherently. That was a finding by the Board, and I don't believe that that's been directly challenged on this appeal. Okay. So going back to the examiner's 102 rejection, so when the Board determined that extension 108 is not expressly or inherently disclosed in the reference, then the Board reversed the 102 rejection, okay, as not anticipated, and the Board should have reversed the 103 rejection as well, because the examiner's 103 rejection also relied upon that interpretation of Carl with respect to the extension 108. Now, when the Board said it flowed naturally, okay, we submit that this was an error in logic by the Board. In fact, it's circular logic. From the examiner's point of view, Carl, he interpreted Carl as disclosing that second backwardly folded flap, the extension 108, okay, and therefore it was logical from the examiner's point of view to add a second retaining means to the back of the sleeve, you know, panel 18 on the sleeve, so that the extension 108 could engage with the second retaining means, okay. But now when the Board determined that Carl does not expressly or inherently disclose the second backwardly folded flap, that undermines the obviousness of adding a second retaining means to that back panel of the sleeve, because if there's no extension or there's no tab on the insert, then why have a retaining means? In other words, there would be nothing for the retaining means to engage if there's no second backwardly folded flap. So it's your view that the P tab didn't, you're saying that it would have been obvious to have multiple retaining means, that they were being so rigid as to not include that tab you were talking about. Well, the way the examiner viewed it, the examiner viewed it is that that second backwardly folded flap is there, therefore it would be obvious to have another retaining means to engage it. And when the Board said, well, you know, Carl doesn't explicitly or implicitly disclose that, then you've got to ask, well, why would a person of ordinary skill and an art add a retaining means without at least also adding another flap? But figure six shows both flaps, right? Yes, Your Honor. Figure six shows both flaps. So your theory would be that when you start from the process that when you fold the two over, you're tearing off 108 and throwing it away. Maybe, maybe. I don't know that that's the case, Your Honor, but that's a possibility. It's also a possibility that 108 is in between 102 and 104. It's also possible that they're both folded over the front face. If you tore it off, there wouldn't be any reason to have a retaining means, right? That would be correct. But if you didn't tear it off and you wanted to use it as a secondary closure device, you would have a retaining means. If correct, Your Honor. You're into your rebuttal time now. If you want to save it, we can hear from Ms. Lateef. Yes, Your Honor. May it please the Court. Good morning, Your Honors. Substantial evidence supports the Board's findings that Claim 5 is obvious over Carro and Virupasat. And looking at the prior itself, it's giving you guidance as to what one would do who's looking to improve the locking functionality, which is the purpose of Daylin's invention. So if you take a look at the figures and Carro, and you look at figures six, seven, and eight, it's basically telling you, well, if you want to use the insert as part of the locking functionality, you can extend that additional flap backwards. We agree that flap 108 is not shown as being folded in any particular way, but there is a finite number of possibilities of which to do that, even if we accept Appellant's argument that there is a fourth way, which I don't believe that there is, but even if there was, that's still a really small number. For a person of ordinary skill in the art to look at and say, okay, what would I need to do if I wanted to improve locking functionality? You couple that with the secondary reference, Hassat, which I think I'm pronouncing properly, and Hassat teaches, well, you can have multiple retaining means on opposite sides of a sleeve doing the same thing. So a person of ordinary skill in the art would be able to look at Carro and say, okay, well, if I have two flaps and I want to improve the retaining functionality, the best thing to do would be to take that additional flap 108 and fold it backwards. Was Carro trying to improve functionality as well? Carro does say that you, I want to make sure I'm quoting them properly, if you look at Carro on page APPX 390, it says this package may have one or more internal or external locks. What column and line are we talking about? Oh, I'm sorry. Page APPX 390, column 1, lines 10 through 11. And then also, if you look at that same column, lines 13 and 14, it says this package is focused around providing a child-resistant, senior-friendly unit dose package. And so child-resistant, I think, would also go to having more than one lock, just like the lines above saying you could have one or more internal locks. So to answer you, Your Honor, yes, Carro does look at sort of improving upon the retaining functionality. And it does say here in that section that you've directed us to that it says one or more locks, right? Absolutely, yes. So a person of ordinary skill and the art, looking at Carro and then combining it with a saw, would see that if you wanted to do that, the best way to do that is to have on the internal sleeve opposing locks on opposite ends. So if you can indulge me for a little bit. It's essentially to duplicate what you did for 106. Exactly. You just fold them in, and then one goes backwards, and the other one goes back. And it's very simple, and you've done that. And the bottom, bottom line, your argument is one of ordinary skill and the art clearly would have known how to use one tab to fold it over and have a retaining means to close it. Absolutely, Your Honor, if you'd have one lock. And so what would stand in the way of taking Carro and taking one of the three options, which is to fold it backwards under with a retaining means? I agree, Your Honor. If you have one lock and you want to improve locking functionality, you add an additional lock. Do you know the answer to the presiding judge's question about the pills? It was. Six and seven. I had the same question whether or not there was any significance to the pills that are in the 108 tab, moving from first and second base, moving, avoiding first base and going to second and third, and then coming back and being on first and second. So based on when I look at these pictures, I see it as the pills are moved. However, I don't have necessarily support in the reference itself telling me that. There's no explanation in the written description. Right. There's no explanation, but it would appear to me just based on the way the pictures are positioned that the pills would have had to have moved. I don't know if that answers your question. And figure seven is supposed to depict the folded over version of figure six? Yes. I view that as if you look at figure six, what ended up happening was that tab 104 is now behind tab 102. So if you have it like this, it's just folded under. Do you have any view on the argument that 106 might actually be mislabeled in figure eight, and, in fact, it should be 108? Well, I disagree with that, Your Honor, specifically because if you look at figure six first, when they're laid out together, and I think those hashtag lines or whatever you want to call them, the lines that are located on 106 are showing one side, and then if you look at 108, having no lines shows an additional sort of the reverse side. So if we were to look at the opposite side of 106, it would be blank. And the reason I'm sort of pointing that out is if you then jump to figure seven, I think what you're seeing is tab 104 has been sort of tucked underneath, and so it makes... Folded 104 under 102, which shows... Exactly. So you're still going to have those same lines sitting there. And then when you jump down to figure eight and you fold 106 backwards, now you see the blank side. It's just a way to show you sort of top-bottom without denoting top and bottom. The front and back side of the tab, you mean, right? I'm sorry, Your Honor, I didn't hear. The front and back side of the tab. Yes. When you fold the tab over. Okay. Yes, Your Honor. If there are no further questions, I'll yield my time, and I ask that the Court affirm the Board's decision. You have a little under three minutes. Thank you. Your Honor, I'd like to very briefly address our second argument with respect to why the 103 rejection cannot be sustained and why the combination of Karl and Viro Hisa is based on hindsight and is not supported by substantial evidence. Specifically, if you reproduce the retaining means of the sleeve of Karl, the cutout and node that appears on panel 10 of the sleeve, if you repeat that on panel 18, the back panel of the sleeve, and then as the Board indicated, repurpose extension 108 to engage that, you don't have a functional package. There's no release button to release it, and also you have an opening in the back of the package where that cutout would be. Really, to make a functional package, we argued below that you would have to add a fourth panel with a release button and double up the back of Karl's sleeve. Below, the prior art we submit doesn't support that modification. The examiner made no finding that adding a fourth panel with a second release button would be obvious to one of ordinary skill in the art, and the Board expressly conceded that neither Karl nor Hisa explicitly teaches the desirability of adding another panel for this purpose. Accordingly, there was no factual support for the modification of Karl to add a fourth panel with a second release button. Nevertheless, despite this lack of factual foundation, the Board concluded that it would be an obvious expedience to add both the fourth panel with the second release button and to repurpose Karl's extension 108. We submit that that was legal error, Your Honors. This Court has repeatedly held that obviousness cannot be based upon conclusory assertions like the Board made here, said it was an obvious expedient. Absent a factual foundation or an articulated rationale for doing that, we cited in Ray Van Oz for that purpose. Thank you, Your Honors. Thank you so much. And the case is submitted.